# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **TIMOTHY CHARLES HOLMSETH**<br><br>    **Plaintiff,**<br><br>        **v.**<br><br>    **CITY OF EAST GRAND FORKS, a municipal entity in the state of Minnesota; RONALD GALSTAD, city attorney for City of East Grand Forks, in his official and individual capacity; BARB ERDMAN, Sheriff of Polk County, Minnesota, in her official and individual capacity; JAMES RICHTER, director of Economic Development and Housing Authority (retired), in his official and individual capacity; MICHAEL HEDLUND, chief of police for City of East Grand Forks, in his official and individual capacity; DAVID MURPHY, administrator for the City of East Grand Forks, in his official and individual capacity; RODNEY HAJICEK, lieutenant detective at East Grand Forks Police Department, in his official and individual capacity; AEISSO SCHRÁGE, police officer at East Grand Forks Police Department, in his official and individual capacity; MICHAEL LACOURSIERE, public defender for MINNESOTA PUBLIC DEFENDER'S OFFICE, in his official and individual capacity; JOHN DOE, in his/her official and individual capacity; JEANETTE RINGUETTE, administrative assistant at the Grand Forks National Weather Service Office, in her official and individual capacity; MICHAEL NORLAND, deputy at the Polk County Sheriff's Office, in his official and individual capacity;**<br><br>    **Defendants.** | **CIVIL ACTION NO: 14-CV-2970 (DWF/LIB)**<br><br>**JURY TRIAL DEMANDED**<br><br>**PLAINTIFF'S FIRST AMENDED ORIGINAL COMPLAINT**<br><br>**Deprivation of Rights (42 U.S.C. – 1983)**<br><br>**CIVIL RIGHTS** |



RECEIVED
BY MAIL
SEP 10 2014
CLERK, US DISTRICT COURT
MINNEAPOLIS, MN



SCANNED
SEP 10 2014
U.S. DISTRICT COURT MPLS

## I.  PLAINTIFF'S FIRST AMENDED ORIGINAL COMPLAINT

Plaintiff, Timothy Holmseth, hereby sues Defendants, CITY OF EAST GRAND
FORKS; RONALD GALSTAD, in his official and individual capacity as EAST GRAND
FORKS CITY ATTORNEY; BARB ERDMAN, in her official and individual capacity as
Sheriff of Polk County, Minnesota; MICHAEL HEDLUND in his official and individual
capacity as EAST GRAND FORKS CHIEF OF POLICE; JAMES RICHTER in his
official and individual capacity as (former) DIRECTOR OF ECONOMIC
DEVELOPMENT AND HOUSING AUTHORITY – EAST GRAND FORKS; DAVID
MURPHY, in his official and individual capacity as EAST GRAND FORKS CITY
ADMINISTRATOR; RODNEY HAJICEK in his official and individual capacity as
EAST GRAND FORKS POLICE OFFICER; AEISSO SCHRAGE, in his official and
individual capacity as EAST GRAND FORKS POLICE OFFICER; JEANNETTE
RINGUETTE, in her official and individual capacity; JOHN DOE in his/her official and
individual capacity; and MICHAEL NORLAND, a deputy at the Polk County Sheriff's
Office in his official and individual capacity.

## II.  JURISDICTION

1.  This is a civil action under 42 U.S.C. – 1983 and 42 U.S.C. – 1981 seeking money
    damages against Defendant(s) for committing acts, under color of law, with the
    intent and for the purpose of depriving Plaintiff of rights secured under the
    Constitution and laws of the United States Bill of Rights, those being, but not
    expressly limited to, the 1st, 2nd, 4th, 6th, and 14th Amendments, and retaliating
    against Plaintiff for exercise of constitutionally protected speech; and for refusing
    or neglecting to prevent such deprivations and denials to Plaintiff.

2.  This case arises under the United States Constitution and 42 U.S.C. section 1983
    and 42 U.S.C - 1981. This Court has jurisdiction under 28 U.S.C. § 1331.

3.  Plaintiff brings this action resulting from damages incurred as result of being
    targeted for rights violations by the Defendant(s).

4.  This Court is the appropriate venue for this cause pursuant to 28 U.S.C. – 1391,
    because all Defendants are residents of the State in which the District is located.

## III.  PARTIES

5.  At all time relevant hereto, Plaintiff TIMOTHY HOLMSETH, has been a resident
    of East Grand Forks, Minnesota.

6.  Defendant, RONALD GALSTAD, at all times relevant hereto, was the EAST
    GRAND FORKS CITY ATTORNEY and a resident of Minnesota.

7. Defendant, BARB ERDMAN, at all times relevant hereto, was the POLK COUNTY SHERIFF and a resident of Minnesota.

8. Defendant, MICHAEL NORLAND, at all times relevant hereto, was a Polk County Deputy, and a resident of Minnesota.

9. Defendant, MICHAEL HEDLUND, at all times relevant hereto, was the EAST GRAND FORKS CHIEF OF POLICE and a resident of Minnesota.

10. Defendant, JAMES RICHTER, at all times relevant hereto, was the DIRECTOR OF ECONOMIC DEVELOPMENT AND HOUSING AUTHORITY – EAST GRAND FORKS and a resident of Minnesota.

11. Defendant, DAVID MURPHY, at all times relevant hereto, was the EAST GRAND FORKS CITY ADMINISTRATOR, and is believed by Plaintiff to be a resident of Minnesota.

12. Defendant, RODNEY HAJICEK, at all times relevant hereto, was an EAST GRAND FORKS POLICE OFFICER and a resident of Minnesota.

13. Defendant, AEISSO SCHRAGE, at all times relevant hereto, was an EAST GRAND FORKS POLICE OFFICER and a resident of Minnesota.

14. Defendant, MICHAEL LACOURSIERE, at all times relevant hereto, was an attorney for the MINNESOTA PUBLIC DEFENDER'S OFFICE and a resident of Minnesota.

15. Defendant, JEANETTE RINGUETTE, at all times relevant hereto, was the OFFICIAL REPRESENTATIVE for all relevant matters hereof at the GRAND FORKS NATIONAL WEATHER SERVICE and a resident of Minnesota.

16. Defendant, JOHN DOE's information is presently unknown.

17. Defendant CITY OF EAST GRAND FORKS is defined as a 'person' within the meaning of 42 U.S.C. section 1983.

## PRELIMINARY STATEMENT

This 42 U.S.C. 1983 Deprivation of Rights case has been brought in the fullness of time.

Facts and circumstances set forth herein show that in 2008, Timothy Charles Holmseth (hereby referred to as Plaintiff or Holmseth), a respected and law abiding citizen, unwittingly re-located into an area that was infested with corruption, of which he soon became the target.

In 1999, the East Grand Forks Economic Development and Housing Authority (EDHA) loaned a company called Boardwalk Enterprises LLP $510,000 at zero percent interest for a post-flood building project. Annual $30,000 payments were scheduled to begin in 2003 and finish in 2019. The mortgage was never filed and no payments were ever made on the loan. The building in question was owned by the Mayor's brother; and two city attorneys had been quietly involved in the conspiracy of silence as a small group of public officials were quietly running out the statute of limitations on the fraud and money laundering scheme.

In 2008, Plaintiff, an award-winning news reporter re-located to East Grand Forks, Minnesota from Breckenridge, Minnesota where he had been the Minnesota Government Reporter for the Wahpeton Daily News. He began a freelance writing service, and in 2009 he established media agreements with legal professionals in Florida involved in the search for a missing child named HaLeigh Cummings. SEE EXHIBIT A

Soon thereafter, Plaintiff learned he had interviewed law enforcement's suspects in the HaLeigh Cummings kidnapping; as well as parties/witnesses involved in the Casey Anthony murder trial. The missing child HaLeigh Cummings' mother's lawyer, Kim Picazio, had been questioned by law enforcement per their belief she transported HaLeigh across state lines.

Plaintiff interviewed Kim Picazio, and she advised that she herself was legally represented by a Florida law firm, Rothstein, Rosenfeldt, & Adler. In 2010, Scott Rothstein, CEO of the law firm, having pled guilty to RICO charges was sentenced to 50 years in prison. Scott Rothstein operated the biggest Ponzi scheme in the history of Florida - $1.2 Billion.

Kim Picazio told Plaintiff she was "coordinating" leads in the HaLeigh Cummings investigation and working closely with Putnam County Sheriff's Office detectives including Captain Dominic Piscitello and Detective Peggy Cone. She told Plaintiff her team of "investigators" were working on the HaLeigh Cummings case. Plaintiff would soon discover her 'team of investigators' consisted of felons, pedophiles, and human traffickers.

William Staubs, a private investigator working for Kim Picazio, told Plaintiff that Kim Picazio and her husband, Michael Picazio, were involved in a biofuels deal that guaranteed them a back-door government contract involving Scott Rothstein and (then) Florida Governor Charlie Crist, in the hundreds of millions of dollars. William Staubs sent Plaintiff an audio recording of Kim Picazio talking to another kidnapping suspect, Jeremiah Regan, and telling him she had been promised $231 Million. Staubs told Dana Treen at the Jacksonville Times-Union that Kim Picazio promised Jeremiah Regan $2 Million if he kept his mouth shut.

In June of 2009 Kim Picazio and her associates began calling the East Grand Forks Police Department (EGFPD) in Minnesota and asking for special favors – particularly – they wanted the local police to circumvent the media contract that existed between

Plaintiff and Kim Picazio, and use law enforcement powers to prevent Plaintiff from writing about the kidnapping and stop him from cooperating with the FBI. The callers were using a paid media consultant, who sometimes appeared on the Nancy Grace Show, but was falsely identifying himself as a CNN reporter, to un-nerve the local police department and local newspaper.

The City of East Grand Forks and rogue elements of the judicial community lay siege to Plaintiff's publication and utilized virtually every government and law enforcement resource available to them as they set out to violate Plaintiff's rights. Plaintiff's ability to thrive was completely and utterly decimated by the non-stop tyrannical activities of the corrupt officials that endeavored to destroy his reputation, business, and family.

Between 2009 and 2014, Plaintiff was stalked from job to job, forced to live on welfare, and defamed beyond comprehension. But he persevered. He continued operating his publication on a shoe-string budget, while independently investigating local officials, gathering information, and reporting the corrupt and illegal activities to state and federal law enforcement.

In December of 2013 Plaintiff reported the City of East Grand Forks to the Minnesota State Auditor and requested and audit and investigation.

In April of 2014 an audit exposed the tip of the ice-berg that Plaintiff was investigating when the Grand Forks Herald and WDAZ reported '$510,000 loan to EGF goes unpaid for 10 years'.

EDHA Director James Richter would soon retire under a cloud of suspicion. As an investigation into the 'Boardwalk Enterprises' scandal continued, EGF City Attorney Ronald Galstad would be replaced by an outside attorney where the investigation of 'Boardwalk Enterprises' was concerned.

An official public (closed door) meeting held on May 7, 2014, between EGF city officials and representatives of Boardwalk Enterprises at the private office of Ronald Galstad (Galstad, Jensen, and McCann). EGF Administrator David Murphy told WDAZ that city officials met with Boardwalk Enterprises and their "attorney". When asked later, Brad Sinclair, the attorney representing the City, would not discuss who Boardwalk Enterprise's attorney was at the May 7, 2014 meeting. The City would also not state whether or not Ronald Galstad represented the City at the meeting. Facts and circumstances indicate Ronald Galstad may have been the attorney for both Boardwalk Enterprises and the City at the same meeting.

On August 25, 2014, the Grand Forks Herald reported that Minnesota Open Meeting law expert, Attorney Mark Anfinson, determined EGF officials had violated the Minnesota Open Meeting Law on August 11, 2014, when they met behind closed doors with Boardwalk Enterprises.

It was clear City officials were/are attempting to cover-up and conceal the identity of all the players in the Boardwalk Enterprises money laundering scheme by holding illegal meetings not open to the public.

The City of East Grand Forks and the 9th Minnesota Judicial District is infested with corruption of rogue officials.

Set forth herein – evidence, records, facts, circumstances, testimony, and witnesses, reveal both James Richter and Ronald Galstad, along with the assistance of the EGFPD, other government employees, as well as judicial officers, began violating Plaintiff's rights in 2009 and never stopped.

## SPECIAL CIRCUMSTANCES

Because Plaintiff's computer's hard-drive was rendered inoperable while in the custody of the EGFPD, the exhibits presented in support of this Complaint are not all the exhibits that exist. Rather, the attached exhibits are the exhibits Plaintiff could readily acquire at the time of this filing.

## IV.  FACTS

### A.  TIMOTHY CHARLES HOLMSETH

18. Timothy Holmseth, 46, (hereinafter "Plaintiff" or "Holmseth") is a news reporter, journalist, songwriter, and author with an Associates Degree in Media Communications from Northland Community College, Thief River Falls, Minnesota. He has received first place awards from the North Dakota News Paper Association (NDNA) for his writing and reporting. He has worked contractually with music companies as a songwriter. He has worked contractually with magazines as a feature content writer.

19. Plaintiff received a first place award from the NDNA in 2007 for Best News Series for a story he covered spanning nearly a year. His professional references include a county attorney, elected officials, and hand-written letters of commendation from respected community leaders. He has served beside local leaders on community civic boards and invited to be a featured guest speaker at a public event. He has passed a federal background check performed through the United States Department of Commerce to work in a secure federal facility and move freely through secure areas. He was deemed "credible" during a kidnapping investigation by a special agent of the FBI.

20. Plaintiff is a successful single parent and had sole physical custody of his daughter from the time she was approximately four years-old until adulthood – she now studies at the University of Minnesota.

21. Plaintiff moved to East Grand Forks with his daughter in 2008 to be closer to his small son (of another relationship) of whom Plaintiff shares joint legal custody.

22. In 2008, Plaintiff began developing a freelance writing business with aspirations to grow the business into a full service writing business and publishing company.

## B. PLAINTIFF CONDUCTS JOURNALISM INTERVIEWS WITH KEY FIGURES IN NATIONAL PROFILE CHILD MURDER AND KIDNAPPING CASES IN FLORIDA

23. In April of 2009, Plaintiff was contacted by Rev. Richard Grund, a case witness in the Casey Anthony murder trial in Florida. The Casey Anthony murder trial was a high profile murder case that has been called the 'social media trial of the century'. Grund wanted to talk to Plaintiff about two child cases in Florida – the missing child HaLeigh Cummings and murdered toddler Caylee Anthony.

24. Plaintiff's communications with Rev. Grund led to recorded journalistic interviews with many others involved in the Florida cases including William Staubs (a.k.a. Cobra the Bounty Hunter), Attorney Kim Picazio, and nationally renowned Author/Victim's Advocate Wayanne Kruger.

25. Plaintiff learned critical information during the interviews regarding the child cases because some of the people he was interviewing were under suspicion by law enforcement in Florida. Plaintiff learned from Attorney Kim Picazio that she (Picazio) and one of her staff members had been questioned by law enforcement per law enforcement's suspicion she and the staffer had transported the missing child HaLeigh Cummings across state lines.

26. In July of 2009 the FBI began to follow up on information they received from Plaintiff regarding the kidnapped child HaLeigh Cummings.

27. In February of 2010 the Minneapolis FBI contacted Plaintiff and requested he come in and be interviewed. The agent requested select audio from his interviews. Plaintiff met with the FBI on several occasions and provided that agency various audio recordings.

## C. PLAINTIFF IS TARGETED FOR DEFAMATION, HARASSMENT, STALKING, BLACKMAIL, EXTORTION, AND THREATS BY KIDNAPPING SUSPECTS

28. Beginning in June of 2009, Kim Picazio (Florida), Donna Wagoner (Florida), Art Harris (Georgia), Cindy Travis (unknown), and Rhonda Callahan (North Dakota) all made reports against Plaintiff to the EGFPD. Lt. Rodney Hajicek recorded the reports in Case Number 09002015 and stated he received numerous reports against Plaintiff but noted all were civil in nature. SEE EXHIBIT B

29. Kim Picazio was the attorney for Crystal Sheffield, who is the mother of the missing child HaLeigh Cummings. Kim Picazio and Plaintiff entered into a media contract whereby Kim Picazio would provide Plaintiff with tips and information on the HaLeigh Cummings case; in return she would receive media exposure from Plaintiff.

30. Kim Picazio is married to Michael Picazio, Fort Lauderdale, Florida. Michael Picazio is a convicted felon – federal fraud.

31. Art Harris is a tabloid blogger and in 2009 was a pundit on the Nancy Grace show. He is formerly of CNN (but was fired during the first Iraq war for disclosing American soldiers positions), and was the paid media consultant working for Kim Picazio and William Staubs. Donna Wagoner was a media events specialist working for Kim Picazio. Rhonda Callahan is the mother of Plaintiff's son, and, email threads show she was in communications with Art Harris, William Staubs, and Kim Picazio, during relevant times, and conspired to file unprecedented child protection complaints against Plaintiff, after Plaintiff began to doing interviews on the HaLeigh Cummings kidnapping case.

32. Beginning in 2009, Plaintiff became the perpetual victim of false police reports, false CPS reports, harassing phone calls, blackmail, extortion, cyber-stalking, slander, defamation, and assault. Evidence, documents, affidavits, police records, and court records show the non-stop attack on Plaintiff stemmed from his journalism on the HaLeigh Cummings and Caylee Anthony cases. Evidence shows the harassment invariably flowed from Kim Picazio, Art Harris, William Staubs, Rhonda Callahan, and agents operating on their behalf. Records show Plaintiff repeatedly asked for help from the EGFPD but was ignored. Evidence shows Kim Picazio was still harassing Plaintiff in 2014.

33. Plaintiff has been relentlessly defamed on a website that was erected in 2009 called www.radionewz.net. The website has published false content about Plaintiff and his children. The website is x-rated and Plaintiff has been repeatedly sexually assaulted online on www.radionewz.net. In 2014, Kim Picazio publicly stated on her law firm's Twitter account that she is the attorney for www.radionewz.net. Facts, circumstances, and belief cause Plaintiff to believe Kim Picazio actually operates the website and authors its content.

### D. EAST GRAND FORKS POLICE DEPARTMENT ACTS AS AGENT FOR KIDNAPPING SUSPECTS – INTIMIDATES PLAINTIFF - TARGETS PLAINTIFF'S BUSINESS

34. On 06/02/09 Lt. Rodney Hajicek reported that he received a call from an attorney named Kim Picazio from Fort Lauderdale, Florida and notes she is representing the mother of a missing child named HaLeigh Cummings. Picazio complains to Hajicek she is receiving "disturbing emails" from Plaintiff and writing things about her on his website www.writeintoaction.com that are not true. Lt. Hajicek

finds it to be a civil issue "but not a criminal issue that I can see at this point".
· SEE EXHIBIT B

35. On 06/18/09 Lt. Hajicek reports that Donna Wagoner of Fort Lauderdale, Florida
telephoned him regarding Plaintiff and a picture (i.e. - digitally altered photograph
of HaLeigh Cummings) Wagoner emailed to Kim Picazio. Wagoner asked Lt.
Hajicek to call Plaintiff and tell Plaintiff she does not want him to write anything
about her Company (Xentel Inc). Lt. Hajicek notes he called Plaintiff and warned
him he will be "advising individuals to seek harassment orders against him in the
future if there appears to be a basis for it". SEE EXHIBIT B

36. Lt. Hajicek telephoned and intimidated Plaintiff on behalf of Xentel Inc, a Florida
based company that has been sued by agencies including State's Attorney
Generals in **Ohio, Colorado, Iowa, Missouri, South Carolina, Michigan,
Wisconsin, Tennessee, Oregon,** for fraud. The story Plaintiff's was developing at
the time was about a Photoshopped picture of an Amber Alert child (HaLeigh
Cummings) being used online to solicit donations from the public by fraudulently
creating the impression the funds would be used to 'search' for the missing child.
The money was actually being used to buy drugs, cell phone minutes, make-up,
and sunglasses. Other money from the public was deposited into a Wachovia bank
account in the name of Kim Picazio. The donations were being illegally solicited
because the not-for-profit charity was not registered with the Florida Department
of Agriculture. Plaintiff had acquired the actual emails featuring the missing child
directly from the Web designer that showed the Photoshopped picture passed
right through Donna Wagoner's email account at Xentel Inc. Plaintiff's
investigative journalism was entirely legal.

37. On 07/20/09 Lt. Hajicek reported he had had subsequently received multiple
complaints against Plaintiff from Cindy Travis, Art Harris, and Rhonda Callahan.
SEE EXHIBIT B

E. EGFPD ASSISTS KIDNAPPING SUSPECTS IN FLORIDA KIDNAPPING
CASE – TARGETS PLAINTIFF'S PUBLISHING BUSINESS WHILE
PLAINTIFF IS ASSISTING THE FBI

ART HARRIS

38. On 07/07/09 an EGFPD officer responded to a request for an officer at the address
of the East Grand Forks Exponent. The name of the caller is redacted in the police
incident report released by the EGFPD. The report said, "[REDACTED]
WANTED TO SPEAK WITH ME ABOUT ART HARRIS, CNN REPORTER,
WHO CALLED TO DISCUSS TIMOTHY HOLMSETH WHO WAS A
FORMER EMPLOYEE OF THE BERGMAN'S. ART ASKED A FEW
QUESTIONS ABOUT TIMOTHY AND NOW [REDACTED] IS NERVOUS
WHAT ART WILL WRITE AND HOW TIMOTHY WILL RESPOND IF SHE

IS BROUGHT UP AT ALL. ART AND TIMOTHY HAVE A BLOG FEUD
GOING ON OVER THE MISSING GIRL FROM FLORIDA". SEE EXHIBIT C

39. Plaintiff would later formally request the name of the redacted caller from the
EGFPD. Police Chief Michael Hedlund refused to provide the name of the
redacted caller. Hedlund stated it was for the safety of the caller. However – the
EGFPD never provided equal such protection to Plaintiff. Rather, the EGFPD
openly recorded Plaintiff's name in every bogus report made against Plaintiff, and
despite admitting Plaintiff was breaking no laws; took adverse action against
Plaintiff and his publication clothed under the 'color of law'.

40. On 07/09/09 Art Harris emailed Lt. Hajicek and asked him to consider "pressing
charges" against Plaintiff. There was no stated reason or basis for 'charges'
because Plaintiff was not breaking any laws whatsoever.

41. On 07/10/09 Art Harris emailed Lt. Hajicek. "I'm in shock, but just heard the FBI
actually paid a visit to the Web design firm in Florida that donated their time to
the website for the missing child. Based on [Timothy Holmseth's] absurd
accusations he's now almost gotten a 23 year employee (Donna Wagoner, Xentel,
Inc) fired for sending the child's photo on her company email to the pro bono web
firm," Harris said.  SEE EXHIBIT D

42. On 07/18/09 Art Harris sent a follow-up email to Lt. Hajicek and asked, "What
did your did DA say?"

43. On 07/20/09, Lt. Hajicek stated in Case Number 09002015 "I have printed all the
emails from my computer and will have the County Attorney's office review them
to see if any other action can be taken". This statement by Hajicek demonstrates
he was seeking to assist those complaining about Plaintiff and was actively
helping them anyway he could. SEE EXHIBIT B

44. The email thread produced by Hajicek only shows the emails authored by Harris.
Hajicek's emails appear to have been strategically removed.

⇒ SUMMARY: During June and July of 2009 the EGFPD is suddenly
bombarded with nuisance complaints from a handful of callers against
Plaintiff, an award-winning journalist writing about a national profile
missing child case involving an active Amber Alert. The callers are all
associated with each other, and encouraging the EGFPD to take criminal
legal action against Plaintiff for things he is writing, although Plaintiff is
not committing any criminal acts. In July of 2009, the EGFPD and Polk
County Attorney learn from one of the contacts that the FBI in Florida is
acting on information they received from Plaintiff regarding the kidnapped
child. The information the FBI is following in Florida, led directly to
THREE of the individuals that were calling the EGFPD on Plaintiff.
Despite this – the EGFPD DID NOT alert the FBI that their informant was

being targeted – but rather - continued and intensified its aggression against Plaintiff – trying to shut Plaintiff up.

45. On 08/14/09, the EGFPD received a report from Rhonda Callahan of suspected 'Child Maltreatment' – 'Concern that kids have access to a loaded gun he reportedly sleeps with'. This fictional report to police resulted in CPS and EGFPD coming to Plaintiff's home and demanding entry and requesting to view Plaintiff's firearm. The report shows Plaintiff's .22 caliber rifle, which he had owned since he was 13 years-old, was unloaded and the clip was stored far away from the rifle (for the safety of his children). The report was unfounded and closed. Emails show this scenario was planned out between Rhonda Callahan and William Staubs. After the event – Art Harris published information about it on the Web to make Plaintiff appear mentally unstable and dangerous; a crazy man having trouble with the police and a danger to his kids.

46. The CPS complaint filed by Rhonda Callahan against Plaintiff was the fifth CPS complaint filed by Callahan in only four months. Every complaint was screened out or unfounded. Callahan began filing the unprecedented complaints shortly after Plaintiff conducted his interviews on the HaLeigh Cummings kidnapping case. Callahan had come into communications with Art Harris, William Staubs, and Kim Picazio, for the first time ever, at around this very time. Email threads that later surfaced show Callahan was discussing Plaintiff with William Staubs, Art Harris, and Kim Picazio. Roseau County Family Court records will show that Callahan's attorney, Michael Jorgenson, admitted in open court he had a conference call with the out-of-state individuals under investigation in the HaLeigh Cummings kidnapping. Jorgenson told Honorable Donna Dixon they had nothing of value to offer during the call and simply kept telling him that Plaintiff was 'crazy'.

47. As of August of 2009, the EGFPD had a wealth of evidence that individuals under investigation in Florida for a kidnapping had suddenly and inexplicably contacted the mother of a local journalist's child, and then collectively, began to file false police and CPS reports against the journalist that was writing about the kidnapping – labeling him crazy and dangerous. Despite this knowledge, the EGFPD did not alert the FBI but continued its siege on Plaintiff and his business.

F.   PLAINTIFF FIRED FROM JOB WORKING FOR CITY OF EAST GRAND FORKS

48. On 09/29/09, Plaintiff began a temporary job working as a traffic counter for the Grand Forks/East Grand Forks Metropolitan Planning Organization. Plaintiff was hired through Express Personnel. Plaintiff met his immediate supervisor at EGF City Hall parking lot. Plaintiff recalls sitting in the office of former EDHA director, James Richter, while being given instructions on how to operate the traffic counter/clicker, etc. On 09/30/09 Plaintiff began his job of counting cars, and then, after counting cars for only a few hours, the supervisor pulled up and

told Plaintiff his job was over. This incident reveals Plaintiff had managed to become briefly employed by the City of EGF because the hiring was done by Express Personnel. When the City of EGF realized they had inadvertently employed Plaintiff he was immediately terminated. SEE EXHIBIT E

### G.  PLAINTIFF INTERVIEWED BY THE MINNEAPOLIS FBI

49. In February of 2010 Plaintiff was interviewed by Special Agent A.J. Eilerman of the Minneapolis FBI regarding interviews he conducted regarding the HaLeigh Cummings kidnapping. Plaintiff was asked for copies of select interviews he conducted. Agent Eilerman told Plaintiff he was going to call the Jacksonville FBI office and tell them Plaintiff was credible.

### H.  PLAINTIFF RELEASES BOOK ABOUT HALEIGH CUMMINGS KIDNAPPING CASE

50. In January of 2011, Plaintiff released his book entitled "In Re: HaLeigh Cummings (the shocking truth revealed)". The book was featured on the television news and sold well upon release. Major Gary Bowling, the director of law enforcement at the Putnam County Sheriff's Office in Florida requested a copy. The book was based upon recorded interviews conducted by Plaintiff. The book is still for sale on Amazon and Plaintiff has never once been sued for anything written in the book because everything is based upon recorded interviews.

### I.  PLAINTIFF STRUCK BY CAR – NO CHARGES FILED AGAINST ASSAILANT BY EGFPD OR POLK COUNTY SHERIFF

51. On 08/22/11 Plaintiff was struck by an automobile driven by his son's mother, Rhonda Callahan. Callahan violently backed into Plaintiff with one car door still open; nearly hitting Plaintiff's teenage daughter. Plaintiff's terrified son was in the car. Callahan then fled the scene and had to be called on the telephone by police and told to come to the police station. The EGFPD did not charge Callahan with any crime, whatsoever. Matthew Petrovich, the guardian ad litem assigned to their child in common, wrote in a GAL report that Callahan told him she 'moved Timothy Holmseth out of the way with the car'. Plaintiff was diagnosed at Altru with "Contusion of Thigh".

### J.  DEFENDANTS ASSIST AND COORDINATE WITH ATTORNEY KIM PICAZIO TO VIOLATE PLAINTIFF'S CIVIL RIGHTS

### THE FLORIDA DIVORCE COURT SCHEME

52. On 09/08/11, Kim Picazio, a <u>CIVIL DIVORCE ATTORNEY</u> [emphasis added], petitioned a <u>FLORIDA DIVORCE COURT</u> (DVCE) [emphasis added] for an injunction for protection against Repeat Violence (a Florida domestic violence

law) against Plaintiff. Plaintiff had/has never met Kim Picazio nor had he been to Florida. The Petition requested the Florida Court order Plaintiff remove any and all content about Kim Picazio from the Web. The request also asked Plaintiff be ordered to turn in all of his firearms, ammunition, and permits to the Broward County Sheriff's Office in Florida. Kim Picazio filed the Petition as a strategic way of circumventing the media contract had with Plaintiff. The Petition was over 300 pages long and appears to have been authored by someone that is mentally ill. It alleged that Plaintiff had engaged in over 1,000 acts of stalking. SEE EXHIBIT A

53. Attempting to defend himself from the ridiculous accusations being made by a media contact with whom he had a well documented contract, Plaintiff made THREE separate requests to the City of EGF for police records. Plaintiff followed exact procedure and filled out the form provided on the rack in the EGFPD lobby and turned it in to the duty officer. Because Kim Picazio had called the EGFPD many times, Plaintiff needed the records to send to the Florida Court, as to defend himself against the fraudulent DVCE (divorce) domestic violence protection injunction being requested by Kim Picazio who was nothing more than a media contact (SEE EXHIBIT A). Lt. Rodney Hajicek refused to provide Plaintiff the records, which was in violation of the City's own posted policy. Plaintiff requested the records THREE times which clearly demonstrates Hajicek's motives were malicious, calculated, and involved forethought.

54. Plaintiff reported to Lt. Hajicek that William Staubs (Attorney Kim Picazio's private investigator) telephoned him from Florida and told him if he traveled to Ft. Lauderdale to attend the court hearing he was very likely going to be murdered by Mob associates of Kim and Michael Picazio (convicted felon – federal fraud). Lt. Hajicek showed no interest and made no report. Plaintiff subsequently provided Lt. Hajicek a sworn Affidavit from William Staubs wherein Staubs stated he eye-witnessed Michael Picazio brandish a Mini 14 Carbine Assault Rifle and declare it was the gun that would be used to shoot "Timothy Holmseth". Staubs stated Kim Picazio was present and laughing. Staubs then telephoned Maria Burgun, a former business partner of Kim and Michael Picazio. Maria Burgun confirmed that Michael Picazio once telephoned her and told her he was going to shoot "Timothy Holmseth" through the door of his home. Lt. Hajicek took no action to record these threat assessments.

55. On 09/19/11, a Florida judge denied Plaintiff's request to appear in court by telephone, and GRANTED Kim Picazio's petition for the Injunction against domestic violence against Plaintiff. The Injunction ordered him to remove everything he had ever published about Kim Picazio from the Web. Everything Plaintiff published was lawfully published in the State of Minnesota. The Florida court further ordered Plaintiff to turn over his firearms, ammunition, and permits to the Broward County Sheriff's Office.  SEE EXHIBIT G

56. The police reports and records that Lt. Hajicek would not turn over to Plaintiff in advance of the Florida court hearing, proved that everything Plaintiff had published was legal and not in violation of any criminal statute. The Florida court never saw Plaintiff's evidence because Hajicek deliberately interfered with Plaintiff's ability to defend himself by withholding the records.

57. On 11/21/11, the EGFPD arrested Plaintiff for allegedly violating the Florida order. Plaintiff was accused of publishing something in violation of the Florida Injunction. The EGFPD did not establish legal Venue to bring the charge – nor did they attempt to establish Venue - but simply brought the charge anyway. The arrest warrant was signed by Lt. Hajicek and EGF City Attorney Ronald Galstad.

58. On 11/22/11, Plaintiff was released from jail on the condition he not publish anything on the Web. Between 11/22/11 and 10/29/12, Plaintiff, a publisher by trade and profession, was legally prohibited from publishing anything at all.

59. On 04/02/12, EGF Police Chief Michael Hedlund responded to a formal complaint filed by Plaintiff regarding the EGFPD's refusal to respond to Plaintiff's requests for public records, which naturally and logically resulted in the issuance of the Injunction by the Florida court that was subsequently used to justify arresting Plaintiff. SEE EXHIBIT H Hedlund apologized and offered to satisfy the records request. Hedlund asked Plaintiff to fill out the 'Document Request Form' again and submit it directly to him. This gesture by Hedlund suggests he does not have the FIRST THREE requests Plaintiff submitted. However, Hedlund's request that Plaintiff fill the form out again would later PROVE his Department was corrupt and hiding documents, because on 12/14/12, the EGFPD suddenly found an envelope full of police incident reports requested by Plaintiff that had been printed out on 10/24/11 (thus proving that somebody had received the records requests and printed the police reports). When the two sets of police incidents are compared to each other, they don't match and information about Kim Picazio and Lt. Hajicek has been removed. SEE EXHIBIT I

K.  DEFENDANT(S) VIOLATE PLAINTIFF'S RIGHT TO TRIAL BY JURY

PLAINTIFF COERCED INTO PLEA DEAL UNDER EXTREME DURESS – PART ONE OF A TWO PART PLAN TO FALSELY CONVICT PLAINTIFF

60. On 10/29/12, after nearly a year, Plaintiff arrived at the Polk County Justice Center prepared for trial. He was charged with violating the Florida court order. He was accompanied by his daughter Marina Holmseth, a case witness. Plaintiff met with Michael LaCoursiere, the public defender assigned to his case. LaCoursiere had told Plaintiff for an entire year he had a very strong case for trial because the City of EGF had no Venue. On the day of the trial, LaCoursiere suddenly and abruptly told Plaintiff that EGF City Attorney Ronald Galstad wanted Plaintiff to accept a plea deal of an Alford plea. Plaintiff declined.

LaCoursiere told Plaintiff that if he refused to accept an Alford plea deal, Galstad was going to call a police officer to the stand to lie. Plaintiff again declined. LaCourisere then added the name of another officer he said he believed was going to be called to lie. The officers LaCoursiere named were EGF Sgt. Detective Chris Olson and Polk County Deputy Jesse Haugen. LaCoursiere told Plaintiff there was a plan by the police to have Plaintiff put in "St. Cloud" state prison. LaCoursiere reminded Plaintiff that if he was in "St. Cloud" he would not be able to see his children. He also told Plaintiff that if he was in prison nobody would ever believe him about what really happened to the "little girl" (HaLeigh Cummings). Plaintiff continued to disagree with LaCoursiere and insisted on a trial.

61. Plaintiff asked Lacoursiere several times if the Prosecution's alleged victim and witness (Kim Picazio) was present for the trial. LaCoursiere would not give Plaintiff a straight answer. LaCoursiere continued to pressure Plaintiff about a plot to have him put in prison, and repeatedly reminded him that the only way to escape the plot by the police was to accept an Alford plea.

62. Plaintiff finally realized his own attorney was in on the plot; succumbed to the coercion; and accepted the Alford plea.

### THE GROUNDWORK FOR PART 2 OF THE PLAN IS LAID DOWN

63. During the Court hearing on 10/29/12, Ronald Galstad proactively REQUESTED the Court allow Michael LaCoursiere remain Plaintiff's attorney until the Compliance Review hearing, which had been scheduled for 12/12/12 was complete. Galstad's request was a DEVIATION from standard procedure and the policy of the Public Defender's Office. According to Public Defender Supervisor Kip Fontaine, Michael LaCoursiere's representation of Plaintiff was supposed to end that day – but Galstad proactively interfered and kept LaCoursiere in place as part of a conspiracy that was unfolding.

64. "If I could, Your Honor, sometimes the Public Defender's office is no longer involved in the case for the review hearing. I would like to specifically make sure on the record that he is still represented by Mr. LaCoursiere. Well, that would be my request," Galstad said.

65. Plaintiff subsequently filed a formal complaint to the Office of Lawyers Professional Responsibility (OLPR) against EGF City Attorney Ronald Galstad and Michael LaCoursiere. The OLPR found that no disciplinary action would be taken without an investigation.

### L. DEFENDANT GALSTAD HAD NO WITNESS/VICTIM TO TESTIFY AT TRIAL BUT PURPORTED TO THE COURT THAT HE DID

66. In December of 2012, Ronald Galstad emailed Judge Tamara Yon requesting that Kim Picazio appear by ITV at a hearing. "Kim Picazio is in Florida and the expense of the judicial economy would dictate that the efficiencies of ITV would serve justice in this matter," Galstad said. The Court never authorized Galstad's request. Notably – Galstad made mention of the "judicial economy" in his argument. He was seeking to spare expenses by forgoing travel, etc. It is common practice for the prosecution to pay for the travel and lodging expenses of their victim/witness.

67. Facts and circumstances indicate Ronald Galstad had no victim/witness (i.e. Kim Picazio) present to testify against Plaintiff at the trial scheduled for 10/29/12, but purported to the Court that he did. Statements by both Ronald Galstad and Honorable Tamara Yon during an exchange at the 10/29/12 hearing show the Court was under the impression the State's witness/victim was present and prepared to testify. It is evidenced by the fact the Judge asked Galstad about "plane tickets".

68. MR. GALSTAD. "The only thing would be that I have testimony by Kim Picazio that just indicated that she did in fact file a petition requesting a temporary order and final order, that she would testify that…" THE COURT: "All right. Now is the State seeking any costs of prosecution?" MR. GALSTAD: "The only costs of prosecution would be one $50 costs of prosecution and it would be combined. It wouldn't be three separate ones for the charges. It would just be one cost of prosecution. There wouldn't be a law library fee or surcharge". THE COURT: "So you're not asking, for example, to pay plane tickets or anything like that?" MR. GALSTAD: "No".

69. In 2014 Plaintiff made a public records request to the City of EGF. Plaintiff requested Accounts Payable records from the City demonstrating the City paid travel and lodging expenses for Kim Picazio on and/or around 10/29/12. David Murphy responded to Plaintiff and advised no such records existed. The City had never paid any expenses for Kim Picazio to travel to Minnesota to testify at a trial.

M. DEFENDANT VIOLATES PLAINTIFF'S RIGHT TO DUE PROCESS – ATTEMPTS TO FRAME PLAINTIFF

70. On 12/12/12 a Compliance Review Hearing was scheduled to assure that Plaintiff had complied with the terms of the Alford plea set forth on 10/29/12.

71. On 12/11/12, Plaintiff received a Motion in the U.S. Mail that had been sent to him by the Polk County Court Administrator. The Motion had been filed by EGF City Attorney Ronald Galstad on 10/06/12 and was requesting the Court adjudicate Plaintiff guilty on all three misdemeanor counts of violating the Florida order. The Motion was supported by very vague statements and did not explain in detail what Plaintiff had done wrong.

72. The Motion was hand delivered by Lt. Detective Rodney Hajicek, EGFPD, to Plaintiff's public defender, Michael LaCoursiere, on 12/10/12. Plaintiff's attorney (LaCoursiere) never advised or notified Plaintiff of the Motion upon service. Because LaCoursiere participated in the coercion that took place on 10/29/12 that resulted in Plaintiff agreeing to the Alford plea in the first place, Plaintiff was already suspicious and cynical. This latest turn of events caused Plaintiff to become even more suspicious of Lacoursiere. Plaintiff emailed LaCoursiere immediately and confronted what appeared to be a set-up.

73. On 12/12/12 a Compliance Review hearing was held. Galstad wanted the Court to hold an Evidentiary Hearing without providing Discovery. He planned to show the Court some You Tube videos lawfully published by Plaintiff many years prior that contained the name "Kim Picazio" buried deep in the scrolling text of various narratives. Galstad was asserting this was a violation of the Alford plea. Plaintiff had gone to great lengths to come into compliance with the Alford plea and Court Order, and the very old videos from years prior had become a layer of sediment in the natural rotation of Web content and gone un-detected by Plaintiff. If the videos would have been pointed out to Plaintiff, he could have just 'deleted' them like he did everything else that he found. If LaCoursiere would have immediately contacted Plaintiff when he was hand served by Hajicek on 12/10/12, Plaintiff could have simply gone on the Web – performed a deep search for the content – and deleted it – thus coming into compliance with the Alford plea by 12/12/12. Therefore – LaCourisre's inaction was extremely detrimental to his own client (Plaintiff).

74. This was clearly the purpose of Ronald Galstad's strange request to the Court to break from standard policy and keep Michael LaCoursiere as Plaintiff's lawyer through the Compliance Review hearing.

75. Evidence shows Ronald Galstad strategically filed the Motion at the last second; Hajicek served it upon LaCoursiere who then stayed quiet about it and intentionally kept the details regarding the alleged violation away from Plaintiff, because Plaintiff had until 12/12/12 to come into compliance with the condition of the Alford plea. Plaintiff caught on to the plot only a few hours before the court hearing and confronted LaCoursiere. Plaintiff brought the email he wrote to LaCoursiere with him to the 12/12/12 hearing and was going to stand up in the middle of the hearing and show the email to Honorable Tamara Yon if LaCoursiere did not request a continuance and Discovery to be produced.

76. Honorable Yon refused to allow Galstad to hold an Evidentiary Hearing on 12/12/12 without turning over Discovery, and a future court date was set.

N. DEFENDANTS CONTINUE TO ASSIST KIM AND MICHAEL PICAZIO – SCOTT ROTHSTEIN ASSOCIATES – KIDNAPPING SUSPECTS – CHILD SEX TRAFFICKERS

77. In Police Report number MN0600200, Lt. Rodney Hajicek continues to accept and record negative reports regarding Plaintiff from Kim and Michael Picazio.

78. On 11/07/12 Lt. Hajicek recorded that Michael Picazio telephoned him. "Mike expressed that he was angry about the posts on line again by Tim Holmseth and informed me that he almost lost a business contract because of the things that Mr. Holmseth is posting," Hajicek said.

79. In 2014, Plaintiff learned from Edward Boyle, the brother of Maria Burgun, a Plaintiff in a civil lawsuit against Michael Picazio (in which she prevailed) that Kim and Michael Picazio are in very deep trouble in the United States Bankruptcy Court before The Honorable Raymond Ray. Judge Ray is also the Judge handling the fallout from the Rothstein case.

80. Boyle told Plaintiff that Michael and Kim Picazio have operated a Ponzi scheme for years and a list of felonies has been submitted to the U.S. Bankruptcy Court by an attorney and/or the Bankruptcy Trustee. Boyle described the detailed Count list of criminal felonies as unfathomable – impossible to describe because it's so big (pages and pages and pages of felonies). Example 1: Michael Picazio didn't file taxes for seven years. Example 2: Michael Picazio allegedly fabricated/forged a court document to cause an official court action to occur. Example 3: Kim Picazio is involved in extensive tax fraud against the U.S. Government. Boyle said the documents are part of an ongoing bankruptcy case and will soon be public record.

81. Wayanne Kruger, an author and victim's advocate that assisted Crystal Sheffield (HaLeigh Cummings' mother) in 2009, told Plaintiff that Michael and Kim Picazio have operated an illegal baby-brokering child trafficking operation and sold infants through the United States Embassy using forged medical documents. Kruger said they executed fake adoptions through the 'church'. They were assisted by a man named John Regan who impersonated a pastor (as well as an FBI agent) but was actually, according to Kruger, a serial child rapist.

82. Despite Kim and Michael Picazio being of horrible repute – Defendant(s) spared no opportunity to assist them against Plaintiff.

O.  RETALIATION - DEFENDANTS STAGE BOGUS BCA TASK FORCE RAID – CREATE FALSE RECORDS – RONALD GALSTAD LIES TO STATE DISTRICT JUDGE

83. On 12/14/12 Attorney LaCoursiere telephoned Plaintiff and wanted to talk about his case. Plaintiff RECORDED this call. At the same time Plaintiff was talking to LaCoursiere, four EGFPD officers were standing quietly outside the door of Plaintiff's home-office with their ear to his door – listening to him talk to his lawyer. After asking Plaintiff to discuss his case; and Plaintiff discussing various things about the case; LaCoursiere then very abruptly terminated the call.

84. Approximately 60 seconds after Plaintiff got off the telephone with LaCoursiere on 12/14/12, the four armed EGFPD officers wearing bullet-proof vests that had been outside his door, stormed Plaintiff's home-office with a Warrant for his computer, hard-drive, cameras, recorders, journalism equipment, etc. The Warrant, signed by Minnesota 9th District Judge Jeff Remick, authorized the EGFPD to "SEIZE THE DESCRIBED PROPERTY AND THINGS, AND RETAIN THEM IN CUSTODY SUBJECT TO COURT ORDER AND ACCORDING TO LAW". SEE EXHIBIT J

85. The Search Warrant did not authorize any forensic search of Plaintiff's hard-drive.

86. Nearly a year later, on 11/27/13, Plaintiff submitted a request for records to the Polk County Sheriff's Office.  On 12/04/13, the Sheriff's Office provided Plaintiff a Sheriff's Incident Report dated 03/29/13. SEE EXHIBIT K On 03/29/13, Sgt. Investigator Michael Norland said, "On 03/29/2013 I was contacted by Lt. Rodney Hajicek with the East Grand Forks Police Department in reference to a hard-drive that was dropped off at our office by Officer Aeisso Schrage with the Pine-to-Prairie Task Force on 12/15/2012". The Clerk advises" There are no documents, outside of the attached report, generated from Sgt. Norland's search of your hard drive or documenting a chain of evidence". SEE EXHIBIT L

87. Sgt. Norland's bizarre entry did not begin a paper trail regarding Plaintiff's hard-drive until 03/29/13, and also introduced a new term regarding a 'task force' - - - "Officer Aeisso Schrage with the Pine-to-Prairie Task Force".

88. In addition to the scenario that the Warrant had been obtained and executed as part of a 'Pine-to-Prairie Gang and Drug Task Force' operation, the EGFPD also placed evidence stickers on Plaintiff's seized property that read "Minnesota Department of Public Safety/Minnesota Bureau of Criminal Apprehension". SEE EXHIBIT M

89. Further advancing the criminal hoax, on 01/04/13, EGF City Attorney Ronald Galstad told Minnesota District Judge Yon, that the Minnesota Bureau of Criminal Apprehension (BCA) was involved with the City's case, and needed a second search warrant to search Plaintiff's hard-drive. Galstad told Judge Yon that the BCA needed the Warrant before they could do a forensic search on the hard-drive. While it would later be revealed Galstad had no relationship with the BCA whatsoever, his statement effectively showed he was aware the search warrant used to seize Plaintiff's property did not authorize a forensic search of Plaintiff's hard-drive.

90. "What I want to do at this point, because he's made it very clear that there was - - there was a search warrant, that they have confiscated and have into evidence his computer. I've just been notified that the BCA, before they'll do a forensic search

of that computer, wants either an order of this Court or a search warrant that says that they can - - we got the original search warrant, but for whatever reason the BCA wants something that says they can actually search that hard drive," Galstad said.

91. On 01/03/14 Plaintiff filed a complaint to Polk County Sheriff Barb Erdman against Sgt. Michael Norland. On 01/31/14 Erdman advised Plaintiff she did not believed Norland's search of the hard-drive was illegal.

92. Plaintiff contacted the BCA to find out if Galstad and the EGFPD had been working with them regarding his hard-drive, etc. On 12/09/13, Jill Oliveira, public information officer, Minnesota Department of Public Safety, said, "The BCA had no role in the investigation you describe and did not attach any tags to evidence in that case". SEE EXHIBIT N

93. On 12/13/13, Drew Evans, assistant superintendent, BCA, said "We were not requested to conduct a forensic examination of your computer. On 12/16/13, Drew Evans said "There are no BCA personnel serving on [the Pine-to-Prairie-Drug-Task-Force]. SEE EXHIBIT O

P.  EGFPD TURNS OVER HIDDEN POLICE REPORTS – POLICE REPORTS CONTAIN DIFFERING INFORMATION – INFORMATION ABOUT "KIM PICAZIO" AND "LT. HAJICEK" AND A "RECORDING" OF THE CALL TO POLICE BY KIM PICAZIO HAS BEEN REMOVED FROM THE REPORTS

94. During the 12/14/12 raid on Plaintiff's home-office, Sgt. Detective Chris Olson, EGFPD, abruptly advised Plaintiff there was a "white envelope" with his name on it at the police station. Plaintiff subsequently picked up the envelope and found it contained police incident reports that had been printed out on 10/24/11 (these would have been the police incident reports Plaintiff requested three times prior to the Florida court hearing regarding Kim Picazio and the fraudulent divorce court scheme).

95. Plaintiff compared the information contained in the 'White Envelope Reports' with the information contained in the same reports, which he received from Police Chief Michael Hedlund on 04/18/12. One of the 'White Envelope Reports' did not match the "Hedlund Reports". One of the 'White Envelope Reports' was missing information about "Kim Picazio" "Lt. Hajicek" and a "recording" regarding a call to the police made by Kim Picazio regarding Plaintiff. SEE EXHIBIT I

96. When Plaintiff requested a copy of the audio of the telephone call made by Kim Picazio to the police he was told by Michael Hedlund the audio had been destroyed.

Q.  RONALD GALSTAD EXTORTS PLAINTIFF

97. Between 12/14/12 and the time of an agreement, Defendant used the City's possession of Plaintiff's property as a bargaining tool to extort Plaintiff. Before the bargaining process was over – Plaintiff had withdrawn his formal complaint to the OLPR against Galstad, and was also required to remove articles critical of local officials that he had authored and lawfully published on the Web.

## R.   EGFPD DESTROYS PLAINTIFF'S COMPUTER HARD-DRIVE

98. On April 26, 2013 Plaintiff's hard-drive and other seized items were returned by order of the court. The property was returned to him by Officer Aeisso Schrage. When Plaintiff attempted to start his computer it would not start. He looked inside and found wires had been moved around and tampered with. He re-situated the wires. The computer then started but behaved erratically. Plaintiff took a screenshot of the Administrator log, which shows when the computer has been turned on. He saved the screenshot on a flash drive. The computer crashed a few minutes later. He took the hard-drive to Best Buy and their experts said it could only be recovered in a forensic lab. SEE EXHIBIT P

## S.   PLAINTIFF'S LIFE THREATENED AGAIN

99. On July 3, 2013, Michael Callahan, the ex-husband of Rhonda Callahan, traveled to Plaintiff's residence, after first conferring with Rhonda Callahan. Michael Callahan repeatedly warned Plaintiff he was going to kill Plaintiff if he filed a court motion in the family court. Plaintiff's daughter, Marina Holmseth, secretly recorded the threats, which captured Michael Callahan warning him repeatedly he would be 'found dead' because 'accidents happen'. Despite having the recording, the EGFPD did not charge Michael Callahan with a felony – rather – disorderly conduct – a non-violent misdemeanor.

## T.   MICHAEL HEDLUND COVERS UP POLICE MISCONDUCT – FALSE POLICE REPORT

100.     On 08/15/13, Plaintiff filed a Complaint against EGFPD officer Aeisso Schrage for making a false statement in an official police report. Schrage used quotation marks and directly quoted Plaintiff making an incriminating statement to his attorney on the telephone, which Schrage claimed he overheard Plaintiff make while eaves-dropping through the door on 12/14/12, shortly before the police raid on Plaintiffs home-office. Plaintiff was recording his conversation with his lawyer and the recording proves beyond any doubt whatsoever that Plaintiff absolutely never made the statement Schrage swore he made. Schrage report said, "On 12/14/2012 at approximately 1410 hours, TFO SHRAGE, along with DET OLSON, OFC HART, and OFC SCHILKE executed a search warrant for the residence of TIMOTHY HOLMSETH. When we arrived we overheard HOLMSETH talking to someone on the telephone, rather loudly, about taking some videos off the internet and that he "MUST HAVE FORGOTTEN SOME."

We knocked and announced and the door was answered by HOLMSETH".
Despite the indisputable proof that the officer lied, EGF Chief Michael Hedlund
deemed the complaint "unfounded".

101.     On 12/06/13, EGF Chief Hedlund responded to a document request made
by Plaintiff on 11/20/13. Hedlund advised Plaintiff the EGFPD and Polk County
Sheriff's Office kept no 'Chain of Evidence' documentation and there was no
further documentation to provide Plaintiff – including no 'Record of
Examination' for the search of his hard-drive.

U.  CITY OF EGF INSTITUTIONALLY STALKS PLAINTIFF – TAMPERS WITH
    EMPLOYMENT – SHREDS FEDERAL DOCUMENTS DURING OFFICIAL
    AUDIT – GETS PLAINTIFF FIRED FROM ANOTHER JOB

102.     In January of 2014, Plaintiff began a part-time job with Five Star
Enterprises performing janitorial duties at the National Weather Service (NWS)
building in Grand Forks, North Dakota. Plaintiff's agreement with Five Star
included a long-term plan for Plaintiff to utilize his sales and marketing
background to build a client base for Five Star in the Grand Forks metro area.
Once enough cleaning facilities were contracted, an office was to be rented for a
public storefront and operated by Plaintiff.

103.     Plaintiff's income change required he alert Kim Nelson, the housing
program coordinator assigned to his housing assistance (HUD) file at the East
Grand Forks EDHA office, which he subsequently did.

104.     During Plaintiff's in-person meeting with Kim Nelson at the EDHA
office, she pointed out to Plaintiff that Karen Lukasz, also an EDHA housing
coordinator, is married to Michael Lukasz, who works at the NWS building where
Plaintiff was beginning his janitorial job. She also pointed out that Karen Lukasz
and EDHA Director James Richter had been engaged in an extra-marital affair.

105.     There is substantial significance to the fact that James Richter and Karen
Lukasz were aware that Plaintiff was beginning a new job at the NWS – where
Lukasz's husband worked. It is significant because during this very time period,
the EGF EDHA came under an audit. The audit of the EDHA was essentially a
forensic investigation into the bookkeeping practices of James Richter and Karen
Lukasz and revealed serious problems.

106.     The fact the EDHA was being audited is significant and relevant in
regards to Plaintiff, because between 2012 and 2014, Plaintiff reported criminal
activity he encountered and uncovered as an investigative journalist/author. He
reported information to the FBI, United States Attorney, Minnesota Attorney
General, Minnesota State Auditor's Office, Minnesota Bar Association, etc.

107.     On 08/18/13 Plaintiff reported on www.writeintoaction.com the headline 'IRS to audit City of East Grand Forks?' The lead paragraph said, "Un-confirmed reports indicate the IRS may have been alerted to irregularities commonly viewed as red-flags by federal investigators. The irregularities on the check-list are believed to include altered documents and known affiliation with Organized Crime".

108.     On December 2, 2013, Plaintiff reported the City of EGF to the Minnesota State Auditor.

109.     In January of 2014, Plaintiff began his part-time job working for Five Star Enterprises as a janitor at the National Weather Service (NWS) in Grand Forks. Plaintiff was required to submit to a federal background security check conducted by the Office of Security for the United States Department of Commerce. In the interim, Plaintiff was required to have a NWS employee escort into authorized areas of the NWS building when he was cleaning.

110.     Not long after Plaintiff began his janitorial duties at the NWS building, Joe Armstrong, Five Star Enterprises, contacted Plaintiff and said Jeannette Ringuette, their mutual Point of Contact at the NWS facility, had been complaining about Plaintiff.

111.     Plaintiff went online and provided answers to all the questions for the background check and submitted them, along with various required references, to Joseph Lubin, security specialist, Office of Security. Plaintiff used Kim Nelson, a housing specialist at the EGF EDHA/HUD office as a reference to verify his physical address. Plaintiff used Kim Nelson because she was assigned to his HUD file.

112.     In the interim, Plaintiff continued to perform janitorial duties at the NWS building. Joe Armstrong contacted Plaintiff several times and said Jeannette Ringuette continued to make complaints about him.

113.     As of 04/30/14 Plaintiff's background check still had not yet been completed, which seemed like an inordinate amount of time to complete an employment suitability check.

114.     On 04/30/14 the Grand Forks Herald reported "$510,000 loan to EGF goes unpaid for 10 years". The scandal erupted as result of an audit. It was the first story in an emerging series regarding a scandal surrounding a company called "Boardwalk Enterprises" and banks loan(s) that were not being re-paid – rather – effectively – and curiously – documents (e.g. Mortgage) were disappearing from the record.

115.     On 05/01/14 Plaintiff went to the EDHA office and asked to speak to Kim Nelson. Upon sitting down, Kim Nelson advised Plaintiff that she had received

the address verification form from the Office of Security. She advised Plaintiff that her supervisor had instructed her to not send it back to the Office of Security and rather; shred it; which she did. When Plaintiff asked Nelson why her supervisor didn't want her to return something as innocuous as an address verification form she said "because they don't fucking trust me".

116.       On 05/01/14 Plaintiff emailed Joseph Lubin at the Office of Security and told him Kim Nelson had not sent the address verification form in. Plaintiff advised Lubin that Nelson advised she would do it ASAP.

117.       On 05/02/14 Plaintiff emailed Kim Nelson and expressed the belief that somebody in the EDHA office might be trying to sabotage his employment. Nelson responded and said she believed her boss became nervous because the letter was from a federal agency, and, that because she was working from home on medical leave at the time, her supervisor could not see the document, which made her supervisor "nervous" – so her supervisor ordered her to shred it.

118.       Plaintiff was concerned because Kim Nelson had previously told him that Karen Lukasz was associated with the NWS facility through her husband, Michael Lukasz, who is an employee at the NWS.

119.       Kim Nelson also told Plaintiff that James Richter would often use his position to target HUD applicants that he didn't like, and would instruct her (Nelson) to make bogus findings and false medical determinations on applications. She said James Richter had no respect for rules or laws and would do whatever he wanted.

120.       Kim Nelson told Plaintiff that James Richter had been in the paper because money disappeared again. She said he had done that before in the past and stated he always gets away with it. She said "Karen Lukasz" was the 'bookkeeper'.

121.       On 05/08/14, only one week after Plaintiff pointed out to Joseph Lubin that his address verification form had been held up; Plaintiff's security check went through.

122.       On a date between 05/08/14 and 05/21/14, Jeanette Ringuette, approached Plaintiff as he was exiting a secure room at the NWS facility. Plaintiff was accompanied by NWS employee David Kellenbenz. Ringuette said "your clearance went through". She was overtly rude and abrasive. She said (sarcastically) that Plaintiff's clearance had been through for about "two weeks". She angrily said, "I told Joe (Armstrong)". However – her claim to have told Joe Armstrong was simply not true.

123.       Ringuette had deliberately neglected to tell Plaintiff his security check had passed and that he had been deemed suitable for employment. The fact pattern

shows that during those 'two weeks' Ringuette had been pressuring Joe Armstrong to terminate Plaintiff.

124.     On 05/21/14 Plaintiff received a call from Joe Armstrong. Armstrong said he had been receiving complaints from Jeannette Ringuette. Armstrong said Ringuette told him Plaintiff has a 'website' and has had 'problems with the police'. Armstrong said he believed Ringuette wanted him to fire Plaintiff. Plaintiff advised Armstrong during that call that Ringuette recently claimed that she had told Armstrong his (Plaintiff's) security clearance had passed, and claimed he (Armstrong) had known about it for two weeks. Armstrong said that was absolutely not true. He said Ringuette had never told him. Ringuette was lying.

125.     On 05/30/14 Plaintiff filed a formal complaint to the City of EGF regarding the EDHA's deliberate failure to respond to his address verification request and subsequent shredding of a federal document. On 06/12/14 EGF City Administrator David Murphy released his findings of the internal investigation. He found James Richter instructed Kim Nelson to shred Plaintiff's address verification form. Despite finding that Richter ordered Nelson to shred the document; Murphy then found the document was shredded in "error". SEE EXHIBIT S

126.     On 06/12/14 Joe Armstrong called Plaintiff. He said he talked to Ringuette on 06/10/14 during a site visit. Armstrong asked Plaintiff if he wore his uniform to work. He asked Plaintiff if he came to work looking like he 'just got out of bed'. He asked Plaintiff he if 'tucked in his shirt'. He said Ringuette was still trying to get him fired.

127.     On 07/05/14 and 07/06/14 Plaintiff was at the NWS to shampoo the carpet with a commercial cleaner. He sent photos of the completed cleaning job to Joe Armstrong. Armstrong said it looked real good. He said he would be forwarding the photos to Ringuette.

128.     On 07/07/14 Joe Armstrong telephoned Plaintiff and said Plaintiff would be training in an alternate at the NWS facility. He said Plaintiff would train the alternate for one week and then resume regular duties alone. During the call, Armstrong and Plaintiff also discussed their previous arrangement to develop future Five Star contracts in the Grand Forks area, which Plaintiff would supervise. Plaintiff and Armstrong did prospecting and research together on the Web while on the telephone.

129.     On 07/10/14 Plaintiff had eye surgery and could not work. Plaintiff was driven to the NWS facility by his daughter, Marina Holmseth, so he could arrange for the new alternate employee (who spoke limited English) to have a NWS employee escort him through the secure areas. While discussing this with NWS employee Vince Godon, NWS employee Michael Lukasz (husband of EDHA

employee Karen Lukasz) came into the room and called Plaintiff a "total scumbag".

130.    On 07/11/14 Joe Armstrong called Plaintiff and told him he had no choice but to terminate him. He said that Jeanette Ringuette had gone to her superior (believed to be interim NWS supervisor Greg Gust) and continued to complain about Plaintiff. Her superior (presumably Gust) then contacted the corporate office of Five Star Enterprises in Kansas City and complained about Plaintiff. Armstrong said if he didn't terminate Plaintiff, Five Star Enterprises would not be recommended for any federal contracts and their company couldn't take that hit.

## V. THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT (RICO)

131.    Facts and circumstances clearly show Defendant(s) are in violation of RICO.

132.    East Grand Forks, Minnesota and Grand Forks, North Dakota are river cities and their Chamber of Commerce is combined. Ronald Galstad, the city attorney for East Grand Forks, Minnesota, sits on the Executive Committee of the Chamber of Commerce.

133.    The refusal of EGF city officials to discuss Ronald Galstad's official role at the May 7, 2014 public (closed door) meeting held at his private office to discuss Boardwalk Enterprises strongly indicates Defendant City of EGF is covering up serious organized crime.

134.    On 08/25/2014 I reported the activities of local officials to federal authorities.

Timothy Charles Holmseth
320 17th Street N.W.
Unit 17
East Grand Forks, MN
56721
218.773.1299
218.230.1597 (cell)

In Re: Disaster Relief Fraud / Money Laundering

08/25/2014

Denis J. McInerney
Chief, Fraud Section

Timothy Charles Holmseth
320 17th Street N.W.
Unit 17
East Grand Forks, MN
56721
218.773.1299
218.230.1597 (cell)
tholmseth@wiktel.com

In Re: 14-CV-2970 (DWF/LIB)

September 8, 2014

s/KT
U.S. Courthouse
300 South Fourth Street
STE 202
Minneapolis, MN
55415

Clerk,

Please accept my FIRST AMENDED COMPLAINT.

Please make special note that a Defendant has been added and needs to be served –
Michael Norland. I previously submitted Michael Norland's information for service by
the U.S. Marshall's so you should have it on file.

Respectfully submitted,
Timothy Charles Holmseth

RECEIVED
BY MAIL

SEP 1 0 2014

CLERK, US DISTRICT COURT
MINNEAPOLIS, MN